## Rockwood Insurance Co. v. D.E.R.

*Howard Levinson,* for appellant.
*Peter Shelley,* for Commonwealth.

HARNISH, *Member,* February 18, 1981—Docket no. 78-168-S involves the appeal of Rockwood Insurance Company (Rockwood) from the forfeiture by the Commonwealth of Pennsylvania, Department of Environmental Resources (DER) of Surety Bond no. 1006 submitted by Northwest Mining Company, Inc. (Northwest) to DER in Mining Permit 81-7; Docket no. 78-166-S involves the appeal of Rockwood Insurance Company of DER's forfeiture of Surety Bonds nos. 1004 for Permit 30-6 and 1001 for Permit 30-83. These bonds were submitted by Blue Coal Corporation (Blue Coal). Rockwood was surety on each of the above three bonds.

## FINDINGS OF FACT
## No. 78-168-S

1. Appellant is the Rockwood Insurance Company, a Pennsylvania corporation with principal offices located in Rockwood, Pa.

2. Appellee is the Commonwealth of Pennsylvania, Department of Environmental Resources, which has the duty and responsibility of administering the Surface Mining Conservation and Reclamation Act of November 30, 1971, P.L. 554 52 P.S. § 1369.1 et seq. (SMCRA) and the regulations duly promulgated thereunder by the Environmental Quality Board.

3. On or about October 29, 1973, Northwest applied to DER for an amended surface mining permit pursuant to the SMCRA for an operation located in Carbondale Borough and Carbondale Township, Lackawanna County, at the Powder Colliery, also referred to as Savage Stripping (no. 81-7).

4. The mining operation at Permit no. 81-7 had been an active stripping operation prior to the date of the amended permit application.

5. The amendment added five acres to the pre-existing ten acre permit and also indicated that the operator would be stripping at a depth of over 60 feet on four of the 15 acres which required increased bonds.

6. Northwest submitted Rockwood Bond no. SM 1006 in the amount of $4,500 as a surety bond to cover the increased scope of the mining operation at permit no. 81-7. Bond SM 1006 was to cover approximately nine acres at a rate of $500 per acre.

7. A permit was issued to Northwest on February 22, 1974 by the DER for this revised operation.

8. Said permit transferred the pre-existing bond-

ing including SM 1006 posted by Northwest to the new revised permit which consisted of 15 acres.

9. The condition of the surety's obligation on Bond SM 1006 was that Northwest comply with, inter alia, all the requirements of Act 418 (SMCRA) and permit no. 81-7.

10. Northwest operated at permit no. 81-7 after the permit was issued in 1974 and affected the entire 15 acres of the permit including the nine bonded acres.

11. On the date the Bond SM 1006 was declared forfeit—November 21, 1978—none of the 15 acres comprising permit no. 81-7 had been reclaimed by Northwest in accordance with its permit or the SMCRA.

12. The permit application submitted by Northwest contained a timetable for reclamation which complied with the requirements of the SMCRA.

13. Northwest was current with its backfilling operation at permit no. 81-7 when the revised permit was issued in February 1974.

14. The last mining activity by Northwest on permit no. 81-7 took place in the latter part of 1974.

15. After ceasing active operations in 1974, Northwest gave assurances to the DER that it still wanted to operate at permit no. 81-7.

16. Northwest moved its mining equipment off permit no. 81-7 at some time after April, 1975.

17. There are two open pits remaining on permit no. 81-7 with an estimated size of 7628 cubic yards and 4950 cubic yards, respectively.

18. In addition to the two pits remaining, the entire 15 acres under permit has yet to be graded and planted.

No. 78-166-S

1. Appellant is the Rockwood Insurance Com-

pany, a Pennsylvania corporation with principal offices located in Rockwood, Pa.

2. Appellee is the Commonwealth of Pennsylvania, Department of Environmental Resources, which has the duty and responsibility of administering the Surface Mining Conservation and Reclamation Act, 52 P.S. § 1396.1 et seq. (SMCRA) and the regulations duly promulgated thereunder by the Environmental Quality Board.

3. On or about August 23, 1973, Blue Coal Corporation applied to DER for an amendment to an existing surface mining permit pursuant to the SMCRA for an operation located approximately one mile northeast of Glen Lyon, Newport Township, Luzerne County, also referred at as Wanamie no. 19 Colliery—14 Plane (no. 30-83).

4. Prior to amendment, permit no. 30-83 consisted of 22.5 acres with existing bonding of $22,500.

5. Blue Coal by its August 1973, application proposed to increase the size of the permit area to 53.7 acres, adding 31.2 acres to the permit.

6. Of the 31.2 acres added, 23.2 acres were bonded by Bond SM 1001 at $1,000 per acre for the purpose of allowing Blue Coal to strip coal at depths greater than 60 feet; the remaining eight acres were bonded at $500 per acre.

7. Blue Coal submitted to DER Rockwood Bond SM 1001 in the amount of $27,200 in order to bond the operation at permit no. 30-83, which was calculated as per finding of fact six, on the basis of the 31.2 acres amendment.

8. A permit was issued December 13, 1973 by the DER for this amended permit.

9. A copy of the permit was sent to Rockwood and received by Rockwood on December 17, 1973.

10. Said permit memorialized the 31.2 acre

amendment and indicated that the increased acreage and mining plan was bonded in part by Bond SM 1001 in the amount of $27,200.

11. Rockwood sent a letter to DER on February 26, 1974 requesting a confirmation on the amount of Bond SM 1001.

12. The DER responded to Rockwood's letter on March 6, 1974 indicating that the correct amount of the bond held by the DER was $27,200 and enclosed a copy of the bond.

13. Rockwood introduced a Bond SM 1001 bearing a face amount of $20,400. There are signs of erasure in the amount section of both the Rockwood and DER bonds but only DER's bonds has a face amount which is consistent with the permit application filed by Blue Coal and the permit issued by DER.

14. Rockwood's practice in 1973 consisted of issuing blank surety bonds to its agents to fill in, in accordance with the mine permittee's requirements.

15. Rockwood did not communicate in any manner with DER or Blue Coal after receiving the DER's March 6, 1974 letter.

16. The condition of Rockwood's obligation on Bond SM 1001 was that Blue Coal comply with, inter alia, all the requirements of Act 418 (SMCRA) and permit no. 30-83.

17. On or about June 8, 1973, Blue Coal applied to DER for an amendment to an existing surface mining permit for an operation in Newport Township, Luzerne County approximately 0.5 miles northeast of Glen Lyon, Pa., also referred to as Retreat Mountain West (no. 30-6).

18. Prior to amendment, permit no. 30-6 consisted of 33.8 acres with existing bonding of $22,900.

19. Blue Coal by its June 1973 application proposed to increase the size of the permit area to 42.3 acres, adding 8.5 acres.

20. The mining plan submitted by Blue Coal indicated that the new 8.5 acres would all be stripped at depths greater than 60 feet with appropriately higher bonding at $1,000 per acre provided by Bond SM 1004.

21. Blue Coal submitted Rockwood Bond SM 1004 in the amount of $8,500 in order to bond the operation at permit no. 30-6.

22. A permit was issued on December 6, 1973 for this amended permit.

23. The condition of Rockwood's obligation on SM 1004 was that Blue Coal comply with, inter alia, all the requirements of Act 418 (SMCRA) and permit no. 30-6.

24. Permits no. 30-6 and 30-83 were active mining operations prior to the 1973 amendments and continued to be active thereafter until approximately November and March 1976 respectively.

25. From 1973 to the date of bond forfeiture, the DER made numerous attempts to keep Blue Coal in compliance with its backfilling operations.

26. Inspector William Sanders issued Blue Coal a written order on December 17, 1973.

27. Said order stated that the backfilling at permits no. 30-6 and 30-83 was falling behind and needed to be increased.

28. As the result of Blue Coal's continued failure to comply with its backfilling obligations at, inter alia, permits no. 30-6 and 30-83 and its removal of backfilling equipment, the DER initiated official enforcement action in June of 1974 in Luzerne County.

29. The DER entered into a consent decree with Blue Coal in settlement of its enforcement action.

30. The consent decree provided that Blue Coal would either work its sites and bring backfilling into compliance or cease work and reclaim the sites, including permits no. 30-6 and 30-83.

31. The consent decree further required Blue Coal to keep certain equipment on site.

32. Because of Blue Coal's failure to comply with the terms of the consent decree, the DER filed a contempt petition in Luzerne County Court of Common Pleas in April 1975.

33. Blue Coal's ownership and officers changed shortly after the contempt petition was filed, and DER agreed to a temporary moratorium in order, inter alia, to allow the company to reorganize.

34. As the result of the DER's enforcement efforts, additional restoration work was performed by Blue Coal on all its permits, including permits no. 30-6 and 30-83.

35. Blue Coal was not in official violation at the time the permits no. 30-6 and 30-83 were amended in December 1973.

36. Blue Coal failed to reclaim permit no. 30-83 in the manner required by its permit and the SMCRA.

37. The unfulfilled reclamation obligation at permit no. 30-83 includes two open stripping pits of 52,500 cubic yards and 145,000 cubic yards; several small pits; spoils piles of 200,000 cubic yards; and grading and planting of the entire 53.7 acres including the area covered by Bond SM 1001.

38. Blue Coal affected the entire area of permit no. 30-83 after it was amended in December 1973 by its surface mining activities including the area covered by Bond SM 1001.

39. Blue Coal further failed to reclaim permit no. 30-6 in the manner required by its permit and the SMCRA.

40. The unfulfilled reclamation obligation permit no. 30-6 includes a large open stripping pit of 435,600 cubic yards and spoil piles of 630,000 cubic yards, both of which occupy approximately 14.33 acres on the westerly side of the permit area; and grading and planting the entire 42.3 acres including the area covered by Bond SM 1004.

41. Blue Coal affected the entire area of permit no. 30-6 after it was amended in December 1973 by its surface mining activities including the area covered by Bond SM 1004.

42. The large unreclaimed pit shown by Commonwealth's exhibit 17 is within the 8.5 acres added to permit no. 30-6 by Amendment no. 1 in December 1973 and bonded by Bond SM 1004.

## DISCUSSION

The starting point for this discussion is the assignment of the burden of proof concerning the forfeiture of the bonds (upon which Rockwood is surety) to DER. Pursuant to 25 Pa. Code §21.101 the party asserting the affirmative of any issue bears the burden of proof on this issue. In its letter of November 21, 1978 DER, asserted that it was forfeiting inter alia Bonds SM 1001 and SM 1004 because Blue Coal had affected bonded areas during surface mining and had failed to reclaim these areas in accordance with the Surface Mining and Conservation and Reclamation Act, 52 P.S. §1396.1 et seq. (SMCRA). Similar assertions were made by DER when if forfeited Bond SM 1006 (wherein Northwest was the Principal). Thus, DER bears the burden of proof on these issues.

Moreover, bond forfeitures, while not specifically addressed in 25 Pa. Code §21.101(b), are similar to the types of enforcement activities listed therein

(civil penalty complaints; license and/or permit revocations, orders) with respect to which DER is assigned the burden of proof. In addition, in American Casualty Company of Reading, Pennsylvania v. DER, EHB 78-157-S issued January 16, 1981, this board also assigned the burden of proof on the above issues to DER.

Having decided that DER has the burden of proof on the above issues, the next consideration is whether it has properly shouldered this burden. In this regard, DER relied largely upon the testimony of Mr. William A. Sanders as well as certain aerial photographs and overlays.

Mr. Sanders testified with regard to each of the pertinent permit areas that Northwest or Blue Coal, respectively, had affected all portions of the permitted area and had failed to reclaim any portion of any of the permitted areas in accordance with SMCRA.

Mr. Sanders' testimony was bolstered by aerial photographs with overlays of permit areas 30-83, 30-6 and 31-7, Exhibits 2, (78-168), 5 and 3, (78-166), respectively, which clearly show that as of October 30, 1978 each of these permit areas had been affected by mining and that none of these permit areas had been replanted or in part even regarded. Commonwealth's exhibit 17, a photograph which shows a large open pit on permit area 30-6, is also strong proof of the operator's failure to reclaim that site, at least as of June 1977 when it was taken.

Rockwood objected to the entry of these photographs since the bonds were not forfeited until November of 1978 and all photographs were taken prior to this date. However, in view of Mr. Sanders' uncontroverted testimony that mining had ceased and that mining equipment had disappeared from

each permit area prior to November 1978 and his further testimony that conditions did not change at any of the permit areas between the dates the photographs were taken and the forfeiture date, and, finally, in view of Rockwood's failure to introduce any testimony to show that conditions had improved at any of the said permitted areas between the photograph dates and the forfeiture date, this board finds that DER has successfully borne its burden of proof that the bonded areas were affected by Rockwood's mining activities and were not reclaimed as per SMCRA—the obligation specified on each bond.

Rockwood maintains that DER must prove an additional element in order to sustain its bond forfeitures, i.e., the actual costs of restoration for each of the permit areas. Although DER did present testimony concerning restoration unit costs, its evidence in this regard is not site specific. However, DER argues that since bonds filed by mine operators to ensure compliance with SMCRA are penal, rather than indemnification, bonds it does not need to demonstrate damages to claim the full face value of these bonds.

The cases cited by DER and Rockwood are those cited and discussed in American Casualty, supra. Moreover, the provisions of SMCRA relating to the bonds and the language of the bonds themselves are virtually identical to the bonds and provisions of the Anthracite Act construed in American Casualty, supra. Thus, the conclusion reached in American Casualty, supra, that the bonds therein were penal bonds, pertains with equal vigor here.

Rockwood raises another argument with regard to the nature of the bonds not addressed in American Casualty, supra. Rockwood correctly points out that liability accrues upon its bonds in proportion to

the area of land affected at a rate set forth per acre in the bond and that liability can be released upon said bonds on a proportional basis. Rockwood argues that this is an indication that the bonds are not intended to be penal. However the rate of accrual, has no affect where, as here, the entire bonded area has been affected by mining operations. As to the release of a portion of the bond, the board notes that, pursuant to 52 P.S. §1396.4(g) of SMCRA, an operator who has completed a separate step of his approved reclamation plan may request the release of the portion of the bond which relates to the completed portion of the reclamation plan. Conversely, unless or until released by the DER, the bonds remain in full force and effect and, of course, there is no testimony here that any portion of any of the bonds at issue has been released.

Having determined that DER has borne its burden of proof in this matter the only remaining issue is whether Rockwood has fashioned a successful defense out of DER's alleged failure to adequately enforce SMCRA against Blue Coal and Northwest.

The board has some difficulty in addressing this issue because Rockwood's allegations have been discussed by counsel for DER and Rockwood in the context of two very separate legal theories. Rockwood's brief discusses a maxim of surety law, i.e., release of the surety by conduct of the obligee, while DER's brief discusses estoppel by laches. We shall attempt to evaluate both theories.

Assuming for the sake of exploring Rockwood's theory, that DER failed to enforce SMCRA against Blue Coal and Northwest in a timely and effective manner, it is, nevertheless, not clear that Rockwood has stated an adequate defense in the instant action.

A surety is discharged from liability under a bond

when the creditor violates or injures the rights of the surety whether such injury arises from some positive act of the creditor or the creditor's failure to perform some act that it was the duty of the creditor to peform: 72 C.J.S. Principal and Surety §148. On the other hand, the same section of C.J.S. states that mere indulgence, forbearance, or passiveness on the part of creditor where there is no duty to act, will not release the surety. Thus, the question for resolution here is what, if any, specific duty did DER owe to Rockwood to expeditiously enforce SMCRA as against Blue Coal or Northwest.

None of the cases cited by Rockwood sheds any light on this subject: Girard Trust Company v. Aetna Casualty and Surety Company, 11 D. & C. 247 (1928) involved performance bonding on a mineral lease rather than a bond given to insure compliance with a statute. Moreover, in Girard, supra, the obligee had committed clear breaches of its duty to the surety, first, by not informing the surety of the principal's past history of defaulting on the same lease and secondly, by ejecting the principal from the leased premises thereby making it impossible for the principal to perform. Obviously, this case does not support the proposition that DER owed some specific duty to Rockwood.

The other cases cited by Rockwood do not even involve mining as did the Girard matter. In First National Bank and Trust Company v. Stolar, 130 Pa. Superior Ct. 480, 197 Atl. 499 (1938) the creditor-bank affected the value of the surety's undertaking by subordinating the judgment lien of the surety to a (later-filed) mortagage on the same property. In Beaver Trust Company v. Morgan, 259 Pa. 567, 103 Atl. 367 the creditor-holder of a note applied collateral pledged as security for a note upon which there was a surety to the payment of

another obligation of the maker, without consent of the surety, thereby releasing the surety from liability under the note pro tanto the amount of collateral.

Obviously, none of the above cases supports Rockwood's proposition that DER had a duty to Rockwood to enforce SMCRA against Blue Coal or Northwest. The only other case cited by Rockwood to support this position Koehler v. Schwartz, 382 Pa. 352, 115 A. 2d 155 (1955) is woefully off point. In Koehler, supra, the court held that plaintiff motorist who was struck by a truck which had run a red light was not contributorily negligent because he had the right to rely on the truck-driver's compliance with the law (by stopping at the light).

Despite the fact that some persons may feel that they have been run over by DER, DER is not a truck nor is Secretary Jones a truck-driver. To state the, would be, analogy clearly demonstrates its weakness. Moreover, even if DER has a duty not to violate SMCRA or any other law this does not mean that DER has a duty to actively enforce SMCRA. More to the point would be George Eremic v. DER and Chambers Development Company, Inc., EHB 75-283-C, wherein this board held that DER's exercise of its prosecutorial discretion was not a reviewable action, i.e., no party had a right to force DER to enforce a law against a third party.

DER's characterization of Rockwood's theory as estoppel by laches also fails to provide Rockwood an adequate defense.

DER's simple assertion that estoppel cannot be utilized against DER is not supported by Commonwealth, DPW v. UEC, Inc., 483 Pa. 503, 397 A. 2d 779, 785 fn. 6 (1979). In fact, on page 785 of UEC, supra, the Pa. Supreme Court specifically

sanctioned the use of estoppel by laches even against the Commonwealth. However, Commonwealth v.Western Maryland R. R. Company, 377 Pa. 312, 105 A. 2d 336 (1954), cited in footnote six on that page and all the other cases cited therein which involved attempts to estop the Commonwealth from collecting taxes where the Commonwealth had, through mistake or indulgence failed to collect such taxes in the past or do show that the Commonwealth's agents through their conduct cannot change the law. One who is subject to regulation, like one who is subject to tax, cannot avoid it on the basis of past indulgence. Likewise, neither Blue Coal or Northwest could avoid the present application of SMCRA against them even if they proved that SMCRA had not been applied to them in the past. Perhaps, however, Rockwood, is in a different position. It does not seek to prevent the exercise of a governmental function per se but merely to escape liability on its bonds alleging that DER is estopped now to deny that fact which it had implicitly stated by not enforcing SMCRA against Blue Coal or Northwest, i.e., their compliance with SMCRA, the Pennsylvania Supreme Court actually applied the doctrines of estoppel, laches and waiver against the Commonwealth in Commonwealth, DER v. Barnes & Tucker Coal Co., 455 Pa. 392, 319 A. 2d 871 (1974) (although in Barnes & Tucker the court held that on the facts stated therein no laches had been made out) it is not clear that Rockwood is legally stopped from raising this argument.*

---

*As to Rockwood's standing to raise this argument, the case cited by DER simply does not support the proposition for which it is stated. Clearly, Rockwood's interest in the bond forfeiture, unlike that of the township in the cited case, is immediate, direct and substantial.

Rockwood still has two insurmountable problems regarding its estoppel by laches argument. First, in order to make out an estoppel, Rockwood must show inter alia that it relied on DER's "promise" to enforce SMCRA against Blue Coal and Northwest, that Rockwood changed its position in reliance upon this "promise" and that it was prejudiced thereby. See 14 P.L.E. Estoppel, §523, 24 and 25.

All of DER's alleged failures to enforce SMCRA occured *after* October 29. 1973, the latest date of execution of any of the three bonds by Rockwood. Thus, Rockwood could not have relied upon or been prejudiced by the alleged conduct.

Moreover, estoppel is an affirmative defense which must be pleaded and proven by the party claiming the estoppel 14 P.L.E. Estoppel §31. Here, Rockwood introduced no witnesses of its own to demonstrate DER's alleged nonfeasance or malfeasance but rather attempted to make out its case on this point by cross-examining DER's witnesses. However, a fair summary of the evidence on this issue reveals that DER repeatedly issued verbal and written orders to the recalcitrant principals and, with regard to Blue Coal, initiated and pursued constant enforcement actions which were, at least partially, effective in restoring a portion of the total acreage affected by Blue Coal's operations. Moreover, Blue Coal was not in official violation at the time permits no. 30-6 and 30-83 were issued in December 1973 nor was Northwest at the time its permit was issued. Given all of these uncontraverted facts it is clear that Rockwood has failed to meet its burden of proving either the affirmative defenses of surety release of or estoppel by laches.

The remaining issues raised by Rockwood may be easily disposed of. Rockwood argues that DER is seeking to impose liabililty on it for areas in addi-

tion to those covered by the bonds in question. Rockwood's argument might have some force except that Mr. Sanders' uncontroverted testimony establishes that Rockwood affected *all* of the area covered by each bond and failed to reclaim *all* of the area covered by each bond. Thus, this board need not and does not consider the state of completion off the bonded areas.

Finally, Rockwood seeks reformation of Bond SM 1001 from the face value of $27,200 which appeared on the bond turned in to DER by Blue Coal to $20,400 which appeared on a copy of a bond bearing the same number introduced into evidence by Rockwood.

Rockwood does not dispute that DER received the $27,200 bond or that the amount thereon was the proper amount to cover the 31.2 acres of land mentioned therein or that DER never received the $20,400 bond or that the $27,200 bond included the signature of David N. Oppenheim, Secretary of Rockwood Insurance Company and a power of attorney empowering Mr. Oppenheim to bind Rockwood. Moreover, the evidence shows that Rockwood's bonds, including Bond SM 1001, were released blank to Rockwood's agent, Robert Price, to be filled in by him to cover the permit requirements so that the board can infer that any mistake concerning the bond amount was caused by Rockwood's agent. Finally, it is clear that DER gave notice to Rockwood of the face amount of $27,200 by copying Rockwood with the permit 30-83. In response to this notice Rockwood did send DER a letter of inquiry. However, after sending DER said letter of inquiry concerning the face amount of Bond SM 1001 on February 26, 1974 and receiving DER's reply and a copy of the $27,000 bond on March 6, 1974, Rockwood took no further action.

Given these facts it is clear that Rockwood does not qualify for reformation of Bond SM 1001 even assuming that this board could grant it.

Reformation might be granted where both parties intended the bond to bear a face value of $20,400. But here it is clear that DER always intended the face amount of Bond SM 1001 to be $27,200. Moreover, it is clear here that no conduct on the part of DER or any of its agents can be characterized as misleading Rockwood regarding the face amount of the bond.

## CONCLUSIONS OF LAW

1. This board has jurisdiction over the subject matter of these proceedings and the parties thereto.

2. Surety Bonds SM 1001, SM 1004 and SM 1006 relating, respectively, to Mining Permits 30-83(A2), 30-6 and 81-7(c) were properly forfeited by DER in their full face amounts.

3. DER's conduct did not release Rockwood as surety on any of the said bonds.

4. DER is not estopped to forfeit any of the said bonds.

5. Rockwood is not entitled to reformation of Bond SM 1001.

## ORDER

And now, February 18, 1981, appellant is ordered to make full and prompt payment to DER of each of the following amounts:

(a) Bond SM 1001 permit no 30-83(A) $27,200
(b) Bond SM 1004 permit no. 30-6 $8,500
(c) Bond SM 1006 permit no. 81-7(c) $4,500